AO 106 (Rev. 04/10)  Application for a Search Warrant (Modified: WAWD 10-26-18)

# UNITED STATES DISTRICT COURT

for the

Western District of Washington

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) )   Case No.  MJ20-263 |
| One Hewlett Packard Spectre laptop (Serial # 5CD73129JP), fully described in Attachment A. | ) ) ) |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A, attached hereto and incorporated herein by reference.

located in the _____ Western _____ District of _____ Washington _____ , there is now concealed *(identify the person or describe the property to be seized):*

See Attachment B, attached hereto and incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 1028A, 1343, 1344, 1519 | Aggravated identity theft; wire fraud; bank fraud; destruction, alteration, or falsification of records |

The application is based on these facts:

✓ See Affidavit of Special Agent Andrew Cropcho, continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Pursuant to Fed. R. Crim. P. 4.1, this warrant is presented: ☑ by reliable electronic means; or ☐ telephonically recorded.

_____
*Applicant's signature*

Andrew Cropcho, Special Agent
*Printed name and title*

○ The foregoing affidavit was sworn to before me and signed in my presence, or
◉ The above-named agent provided a sworn statement attesting to the truth of the foregoing affidavit by telephone.

Date:  May 20, 2020

_____
*Judge's signature*

City and state:  Seattle, Washington

Mary Alice Theiler, United States Magistrate Judge
*Printed name and title*

# AFFIDAVIT

STATE OF WASHINGTON      )
                         )        ss
COUNTY OF KING           )

I, Andrew Cropcho, being duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been since May of 2018. I am currently assigned to the Seattle Field Office. My primary duties include investigating violations of Federal law, including corporate fraud, securities fraud, government program fraud, and healthcare fraud. Part of those duties include investigating instances of wire fraud being used for financial gain at the expense of others. Before my career as an FBI Special Agent I was employed as a Certified Public Accountant for over three years and, as part of my employment, I examined financial information of clients to determine their accuracy, reliability, and sources.

2.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—an electronic device—which is currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

3.      The facts set forth in this Affidavit are based on my own personal investigation; information obtained from other individuals during my participation in this investigation, including other law enforcement officers; the review of documents and records related to this investigation; communications with others who have personal knowledge of the events and circumstances described herein; and information gained through my training and experience.

4.      Because this Affidavit is submitted for the limited purpose of providing sufficient facts necessary to determine whether there is probable cause in support of the application for a search warrant, it does not set forth each and every fact that I or others have

Affidavit of Andrew Cropcho -- Page 1
USAO 2018R00744

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

learned during the course of this investigation. This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

5.      The property to be searched consists of one Hewlett Packard Spectre laptop (Serial # 5CD73129JP) (the "**SUBJECT DEVICE**"), currently located at 1110 3rd Avenue, Seattle, WA 98101, and purchased by Evil Bikes, LLC for JOAN TROWER to perform the job duties she was hired by Evil Bikes to perform.

6.      The applied-for warrant would authorize the forensic examination of the **SUBJECT DEVICE** for the purpose of identifying electronically stored data particularly described in Attachment B.  This warrant is requested in connection with an ongoing investigation in this district by the FBI.

7.      As discussed herein, there is probable cause to believe that the **SUBJECT DEVICE** contains evidence of violations of Title 18, United States Code, Sections 1028A (Aggravated Identity Theft); 1343 (Wire Fraud); 1344 (Bank Fraud); and/or 1519 (Destruction, Alteration, or Falsification of Records).  There is also probable cause to search the information described in Attachment A, for evidence, instrumentalities, or contraband of these crimes, as described in Attachment B.

## JURISDICTION

8.      This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

9.      Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

10.      This warrant application is to be presented electronically pursuant to Local Criminal Rule CrR 41(d)(3).

Affidavit of Andrew Cropcho -- Page 2
USAO 2018R00744

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

## STATEMENT OF PROBABLE CAUSE

**A.      Summary of Investigation**

11.      The FBI has been investigating JOAN TROWER, a resident of Seattle, Washington. TROWER utilized the **SUBJECT DEVICE** to further her scheme of obtaining money from her former employer by means of false or fraudulent pretenses and representations.

12.      TROWER first came to the FBI's attention in May of 2018 when the Chief Operating Officer ("COO") of Evil Bikes, LLC, "J.M.", filed a complaint alleging that TROWER, an independent contractor accountant hired by Evil Bikes, embezzled approximately $250,000.

**B.      Evil Bikes and TROWER's Duties**

13.      Evil Bikes is a bicycle shop that was formerly located in Seattle, WA, but is now located in Bellingham, WA.

14.      In early 2015, Evil Bikes hired TROWER to assist with the company's accounting.  TROWER was hired as an independent contractor, not an employee.  TROWER was employed by Evil Bikes through May of 2018.

15.      TROWER was not a CPA, and did not hold herself out to be one. TROWER did, however, handle a wide-range of accounting-related services, such as book-keeping, payroll, and tax compliance.  Evil Bikes, including TROWER during her time working for Evil Bikes, used QuickBooks to keep track of all of its accounting records.  QuickBooks could also be used to make electronic payment transfers (ACH) from Evil Bikes's bank account.  According to J.M., only "M.P." (the COO of Evil Bikes when TROWER was hired) and another employee, "C.S." had access to QuickBooks. J.M informed me that TROWER would not let anyone into Evil Bikes's QuickBooks database because, she claimed, she did not want people to mess up her records. N.G., an accountant at the accounting firm hired by Evil Bikes after TROWER was fired, informed me that TROWER was the admin user for Evil Bikes's QuickBooks account.

Affidavit of Andrew Cropcho -- Page 3
USAO 2018R00744

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

16.     "M.P." was the COO until in or around June of 2017. M.P. usually paid employees once a month, but he paid TROWER weekly.  M.P. reported that TROWER was often eager to obtain her paycheck each week.  According to M.P., TROWER self-reported her hours by submitting computer-generated invoices to M.P. to support every check he issued to her. Evil Bikes currently only has invoices from TROWER dated between March 2016 and September 2016, with some months in that period appearing to be missing invoices.  It is not known whether that is because the invoices were submitted at one time, but subsequently lost, or whether TROWER did not submit invoices outside of that period.

17.     Based on my review of those invoices, and according to Evil Bikes's COO, TROWER was paid between $15 and $35 per hour, depending on the task she was completing, between 2015 and May 2018.  No invoice reflected a per-hour rate of more than $35.

18.     At the beginning of TROWER's tenure, M.P. filled out each employee's paycheck himself.  Once, however, M.P.'s father-in-law became sick, he relied on TROWER to fill out payroll checks for him, which he later signed when he had the time.

19.     J.M. replaced M.P. around June of 2017.  After that point, minimal records were kept to provide support for the hours TROWER worked or the tasks TROWER completed.  No further invoices were submitted by TROWER.

20.     In July of 2017, J.M. instituted a policy under which employees received two regular paychecks and one check for expense reimbursement per month; therefore, no employee should have received more than three checks in one month.  That policy applied to TROWER, who acknowledged receipt of the email from J.M. outlining the policy.

21.     During J.M.'s tenure as COO, physical checks were the only method of payment for the staff of Evil Bikes, including TROWER.  J.M. relied on TROWER to fill out paychecks for him to sign.  J.M. would then either sign those paychecks afterward, or—in unusual circumstances, as when he would be out of the office—J.M. would pre-sign checks and give them to TROWER to fill in correctly.

Affidavit of Andrew Cropcho -- Page 4
USAO 2018R00744

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

22.     TROWER often worked from home.  (TROWER did come to the office to hand out the paychecks for each employee, and to handle certain other tasks.)  As a result, TROWER often used the **SUBJECT DEVICE** to log-in to QuickBooks remotely, through an online portal provided by a company called Right Networks.  I therefore think it is likely that activity relating to TROWER's activity or communications with Right Networks and QuickBooks may be present on the **SUBJECT DEVICE**.

23.     At all relevant times, both TROWER and Evil Bikes used bank accounts at Wells Fargo Bank.  The primary account for Evil Bikes at Wells Fargo was a business checking account ending in -1505. During most of 2017, TROWER appeared to have access to, and deposited funds into, DAVE JOHNSON's personal checking account at Wells Fargo ending in -7990.  According to K.W. and J.M., JOHNSON was TROWER's boyfriend during all relevant periods.  As is explained in greater detail below, starting in January 2018 TROWER had access and control over, and deposited funds into, a business checking account at Wells Fargo ending in -3309. Finally, in May 2018, TROWER had access and control over, and deposited funds into, her own savings account at Wells Fargo ending in -3710.

**C.     TROWER's Scheme**

**i.     Checks**

24.     As mentioned earlier, in the spring of 2016, M.P. began missing time in the office to care for his father-in-law.  This resulted in TROWER having more control over Evil Bikes's checkbook, because she became responsible for filling out the paychecks.  Even in M.P.'s absence, J.M. stated, the one-check-per-week protocol apparently remained unchanged.

25.     In January and February of 2016, TROWER was paid four times each month. Starting in March of 2016, TROWER cashed six checks from Evil Bikes, right around the time M.P. started to be more absent from work to care for his ailing father-in-law.  From March 2016 through December 2016, TROWER received an average of six checks a month

Affidavit of Andrew Cropcho -- Page 5
USAO 2018R00744

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

from Evil Bikes. From January 2017 through June 2017, TROWER received an average of ten paychecks per month.

26.     J.M. took over as COO in June 2017.  However, TROWER retained control of Evil Bikes's checkbook and was responsible for paying all employees of the company. As mentioned above, J.M. instituted a policy limiting the number of checks paid to each employee (or independent contractor) per month to three. Notwithstanding that policy, TROWER wrote herself an average of eight checks per month between June 2017 and May 2018.

27.     J.M. indicated that he was not sure why he did not know about this high volume of checks being paid to TROWER, given that he was supposed to physically and personally sign each paycheck. There are at least two possible explanations. First, as noted above, in some circumstances, J.M. pre-signed paychecks and gave them to TROWER to fill in; TROWER could have filled in additional paychecks to herself. Second, physical checks could also be printed directly from QuickBooks.  After TROWER was fired, Evil Bikes discovered a "digital signature" for J.M.—an electronic image of J.M.'s signature—in the QuickBooks software.  J.M. never used an electronic signature.  Some of the checks made out to and cashed by TROWER appear to use such an electronic signature: the signature is above the signature line, yet still has a partial line underneath it, indicating that it is an image of a signature that *was* on the signature line.  The photograph below is an example of one such check:

Affidavit of Andrew Cropcho -- Page 6
USAO 2018R00744

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

28.    In most instances where TROWER received one of Evil Bikes's physical checks, instead of depositing it, she cashed it at either a Wells Fargo bank or MoneyTree. TROWER also signed the back of the check, indicating she was the one who negotiated the instrument at the bank. In my training and experience, banks require a signature on the back of a check to, among other things, secure the identity of someone who presents a check issued by a client of the same bank when the holder of the check wants to receive cash instead of depositing the check into a bank account.

29.    Physical checks were also made payable to other entities and persons associated with TROWER:

a.    As further explained below, "JJ Tax and Acctg Services" was a fictional entity formed by TROWER to further her scheme. The entity had its own business bank account (to which TROWER had access) at Wells Fargo ending in -3309. TROWER deposited or cashed five checks that were addressed to the payee "JJ Tax and Acctg Services, "Tax & Acctg. Serv.", or "Tax and Accounting Services", totaling $4,285.66.

b.    JOHNSON, TROWER's boyfriend, was never authorized to perform work for Evil Bikes, according to J.M.  JOHNSON was the named payee on four checks from Evil Bikes, totaling $2,888.07. J.M. informed me that TROWER's Evil

Affidavit of Andrew Cropcho -- Page 7
USAO 2018R00744

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

Bikes's e-mail account had, after TROWER was fired, received e-mails from the Social Security Administration and Snap Finance that were addressed to JOHNSON.

       c.    "J.P." was TROWER's daughter, who (J.M. explained) was never authorized to perform work for Evil Bikes. J.P. was the named payee on seven checks from Evil Bikes, totaling $1,693.75. J.M. informed me that TROWER's Evil Bikes's e-mail account had, after TROWER was fired, received an e-mail from Credit Karma that was addressed to J.P.

**ii.    Electronic Transfers**

    30.    In addition to these physical checks, TROWER also apparently initiated electronic transfers of funds from Evil Bikes's Wells Fargo bank account to TROWER's bank account or bank accounts affiliated with TROWER.  TROWER appears to have initiated, on average, approximately four electronic transfers per month, starting on or around June 28, 2017. Evil Bikes never approved electronic fund transfers as a method of payment for TROWER, and Evil Bikes did not discover these transfers until May 2018. Given that no other employee was responsible for distribution of paychecks, that TROWER had the access and ability to initiate these transfers, that the transfers all went to TROWER or to accounts affiliated with TROWER, and that Evil Bikes's ownership and COO did not approve of or know of these transfers, Evil Bikes and I believe that TROWER initiated these transfers.

    31.    **Transfers to DAVE JOHNSON.** At first, TROWER transferred funds from Evil Bikes's Wells Fargo bank account ending in -1505 into a Wells Fargo bank account ending in -7990, which Wells Fargo records indicate belongs to JOHNSON. Between June 2017 and May 2018, TROWER transferred at least $28,850.74 in funds to JOHNSON's Wells Fargo account.

    32.    **Transfers to "Tax and Acctg Services".**  Eventually, however, TROWER began transferring funds into a different Wells Fargo bank account ending in -3309, which Wells Fargo records indicate is owned by a woman named "J.R." Wells Fargo records also list "J and J Tax And Accounting" as an Associated Party for this account, and TROWER as

Affidavit of Andrew Cropcho -- Page 8
USAO 2018R00744

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

a signer on the account. According to Wells Fargo, an email address associated with TROWER was associated with this bank account.  J.R. opened this account at Wells Fargo on December 27, 2017.

33.     Beginning on 01/04/2018, electronic transfers from Evil Bikes's Wells Fargo account stopped going into JOHNSON's Wells Fargo bank account, and started going into the newly opened joint checking account that J.R. and TROWER had opened. The named payee on these transfers was "Tax and Acctg Services" or, for transfers initiated by the bank-to-bank payment service Zelle, "J.R."  TROWER transferred at least $36,500 to this account between January and May 2018.

34.     On April 29, 2018, Google was used to create the e-mail address "**jjonestaxacct@gmail.com**". The IP Address used to create the e-mail address was 174.21.64.102, which was assigned to TROWER at TROWER's home address on April 29, 2018 according to CenturyLink.

35.     On April 29, 2018, the e-mail address **jjonestaxacct@gmail.com** sent an e-mail to both TROWER and also to a general e-mail address at Evil Bikes monitored by J.M.—accounting@evil-bikes.com.  The email was signed by "Julia R Jones, Accountant/Director."  The email described work that "Julia R Jones" had allegedly performed for Evil Bikes.  TROWER replied to the email exchange by referring to the sender as "Jewel-ia."

36.     On May 8, 2018, TROWER sent an e-mail to K.W. and J.M. where she referenced "Jewel/Julia". In that e-mail, TROWER asserted that Jewel/Julia was a third party through whom tax payments were made.  J.R.'s first name is "Jewel."

37.     J.R. was identified by law enforcement after TROWER was fired by Evil Bikes.  According to J.R., TROWER and J.R. were friends; TROWER prepared J.R.'s taxes; and TROWER convinced J.R. to open a joint bank account with her at Wells Fargo because, TROWER said, it would enable TROWER to better handle J.R.'s taxes.  When asked by Evil Bikes after TROWER was fired, J.R. denied having any knowledge of TROWER's scheme, having ever worked as a tax accountant, and having ever worked with TROWER or on

Affidavit of Andrew Cropcho -- Page 9
USAO 2018R00744

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

anything related to Evil Bikes.  According to LinkedIn, J.R. has worked in technology and supply chain roles at the University of Washington since 2000—roles that do not appear to involve tax or accounting services.

38.     J.R. asserted that she never spent the money in the Wells Fargo account she jointly-owned with TROWER. Instead, J.R. said, she only ever made deposits into the jointly-owned checking account when TROWER incurred overdraft charges on the account. Law enforcement has no reason to believe that J.R.'s representations regarding this account are not true.  Law enforcement is not aware of evidence that J.R. withdrew funds from this account, and J.R. immediately turned this information over to Evil Bikes and law enforcement upon learning of TROWER's dismissal and possible embezzlement from Evil Bikes.  Moreover, J.R. also turned over text messages with TROWER in which J.R., after being informed by Evil Bikes of TROWER's possible embezzlement, says to Trower: "I really pray you clear my name Joan. I would never think you would jeopardize me and my boys. I've been a good friend to you." The user of TROWER's suspected phone replied: "You have no part in ANYTHING and I have and will make that completely clear".

39.     **Transfers to A-Rusulka or M.H.**  At all relevant times, TROWER was the only person responsible for Evil Bikes's accounting.  She was also the only person responsible for tax preparation for Evil Bikes, except for certain tax-year 2015 filings, which were handled by a third-party accounting firm named "A-Rusulka." Based on an interview with that accounting firm's owner, "M.H.", she issued a total of three invoices to Evil Bikes, requesting payments that total $2,017.50 between 2016 and 2017.

40.     However, according to a review of records provided by Wells Fargo, at least $11,975 in payments were made from Evil Bikes to TROWER as payee, mentioning invoices or work done by "A-Rusulka" or M.H. in the memo line.  The actual billed amount by A-Rusulka is $9,958.50 less than these checks would appear to reflect. Moreover, many of the checks were written after A-Rusulka had stopped all work for Evil Bikes and had ceased all communication with TROWER. The excess payments were either cashed by TROWER or deposited into JOHNSON's bank account.

Affidavit of Andrew Cropcho -- Page 10
USAO 2018R00744

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

41.     The e-mail sent by **jjonestaxacct@gmail.com** on April 29, 2018, contained a reference to discussions that allegedly took place between Jones and M.H. about M.H. helping Evil Bikes complete a mortgage loan application. M.H. informed me that she never communicated with anyone named Julia Jones, never communicated with the e-mail address **jjonestaxacct@gmail.com**, did not assist Evil Bikes with any mortgage loan applications, and had not communicated with TROWER at all or done any work for Evil Bikes since the fall of 2017.

42.     On May 8, 2018, to explain why "J.R." or "Julia R Jones" had started to assist with Evil Bikes's accounting and taxes, TROWER asserted that M.H was retiring and that M.H. had asked J.R./"Julia R Jones" to finish Evil Bikes's 2017 tax returns. M.H. informed me that neither of those assertions made by TROWER were true.

**iii.     Expense Reimbursement Based on Fake Invoices**

43.     Employees at Evil Bikes used software called Expensify to submit requests for reimbursement for work-related expenses. On several occasions in 2017, TROWER submitted a request for reimbursement for payments that Trower alleged she had made to M.H. for accounting services rendered to Evil Bikes.  After TROWER was fired, M.H. told me that the invoices were fake; they used the wrong address, and M.H. did not have invoices or payments matching those submitted by TROWER.  M.H. also provided me with all of her billing records for Evil Bikes; as M.H. stated, those records do not reflect invoices or payments matching the invoices submitted by TROWER for reimbursement.  Finally, the PO Box listed by TROWER as the address for M.H. is, according to the U.S. Postal Service, not a real PO Box. Additionally, bank records show that every invoice M.H. issued to Evil Bikes was paid directly by Evil Bikes, and that (at least according to the bank records for TROWER that law enforcement has reviewed) TROWER never used her personal funds to pay M.H. on behalf of Evil Bikes.  All of this leads me to believe that TROWER created fake invoices in order to defraud Evil Bikes and obtain reimbursements to which she was not entitled.

Affidavit of Andrew Cropcho -- Page 11
USAO 2018R00744

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

44.     From January 1, 2017 through the date of her termination on May 8, 2018, TROWER caused herself, or entities/persons affiliated with herself, to receive $262,190.00 from Evil Bikes.  According to TROWER's own estimate, which TROWER told to Evil Bikes, TROWER's actual salary during this period should have supposedly been approximately $4,000 per month.  Even assuming that figure—which is unsupported by actual invoices—were correct, it would indicate that TROWER was not entitled to more than $68,000 between January 2017 and May 2018.  After being fired, TROWER sent Evil Bikes a timesheet purporting to reflect hours TROWER worked between September 2017 and May 2018.  While that timesheet would indicate that TROWER earned around $48,000 during that period, Evil Bikes suspects the time sheets were dramatically inflated.  In any event, even if those timesheets were correct, TROWER received far more than those amounts— approximately $90,000—during that same period through the various schemes outlined above.

### iv.     Alterations to Accounting Journal Entries in QuickBooks

45.     A review of the audit trail of the QuickBooks database for Evil Bikes showed that TROWER often misrepresented payees in journal entries for payments that actually benefitted her.

46.     For instance, Check # 3197 from Evil Bikes's Wells Fargo account was made out to "Joan Trower" for $1,282.50, on October 28, 2017. However, in QuickBooks, on October 30, 2017, the listed payee for Check # 3197 was changed from Joan Trower to "F.L.D.", who was unknown to both M.P. and J.M. A copy of the back of Check # 3197 shows TROWER's signature. Another instance of this happening was Check # 3205, which was made out to "Joan Trower" for $2,228.40 on October 12, 2017. However, in QuickBooks, on November 5, 2017, the listed payee for Check # 3205 was changed from Joan Trower to "A.A.", a designer used by Evil Bikes. A copy of the back of Check # 3205 shows TROWER's signature.

47.     Additionally, 11 electronic payment transfers were made from Evil Bikes's - 1505 account to the business checking account set-up by TROWER and J.R. Of those 11

Affidavit of Andrew Cropcho -- Page 12
USAO 2018R00744

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

transactions, one was not recorded in QuickBooks, and another nine were either deleted or changed to a generic payee description of "Intuit" or "QuickBooks Payroll Service."

**D.     Evidence of TROWER's Consciousness of Guilt:**

48.     On May 8, 2018, Evil Bikes asked TROWER for an explanation regarding the many payments being made to J.R. and other accounting-related entities.  TROWER claimed that J.R. and "Tax and Accounting Services" were a "3rd party electronic payment processor" that Evil Bikes was required to use to pay the IRS.  (Evil Bikes later discovered that they had recently made tens of thousands of dollars in payments to the IRS without having to use a third-party payment processor.) TROWER also claimed that she would meet with J.R. and the fictional accounting firm to get an explanation for their various charges.  TROWER further claimed, as noted above, that M.H. had retired and referred J.R. to TROWER as an accountant for Evil Bikes, both of which statements were false.

49.     That same day, an individual logged into TROWER's Right Networks account—suspected to be TROWER because the IP address of the login is TROWER's IP address—accessed Evil Bikes's QuickBooks database and deleted or altered several entries that had previously shown payments to "Tax and Acctg Services."

50.     After May 8, 2018, J.R. forwarded to Evil Bikes a copy of a text and email conversation that J.R. stated was between her and TROWER. In the text conversation, after J.R. told TROWER to "do the right thing in turn yourself in," TROWER replied "Are they looming [sic] for me?" and "Has a warrant been issued?"  TROWER later states: "I'm going to end this life of chaos and destruction that I've created. Goodbye. . . . I'm going to return the evil property at 4 or 430 today and if the police aren't there waiting, I'll go to Bainbridge and die where I loved to live The consequences are life in prison and that's no life." When J.R. again told TROWER via email that she should contact law enforcement, TROWER replied, among other things: "Going down this road of police and courts will ultimately dredge up a lot of shit on every[me involved and there are more than a few things that would not be good for you if they were to come out. . . . But I'm not dumb and I know the

police, their tactics, and how to get this taken care of in a way that will not compromise you or [J.P.]."

51.     TROWER set up an initial meeting to return property to Evil Bikes, but then did not show up for that meeting. Shortly thereafter, JOHNSON met with J.M. and returned the **SUBJECT DEVICE** that TROWER used while working at Evil Bikes. Evil Bikes funded the purchase of the **SUBJECT DEVICE** for TROWER to fulfill her duties for the company. JOHNSON stated to J.M. that he knew TROWER was committing fraud, but that TROWER would not listen to JOHNSON when he told her to stop.

52.     Once J.M. had possession of the **SUBJECT DEVICE** he attempted to access it but realized its contents had been deleted.

53.     After filing a police report, J.M. gave possession of the **SUBJECT DEVICE** to the Seattle Police Department ("SPD"). I contacted the SPD detective who was assigned to investigate TROWER and we agreed that the FBI would be the sole law enforcement agency to investigate the matter. On June 26, 2018, I took custody of the evidence collected by the SPD, including the **SUBJECT DEVICE**.

54.     A cursory review was performed by Joel Martini, a Special Agent in the Cyber Division of the Seattle FBI, who was also previously a member of the Computer Analysis Response Team. The cursory review, performed for the sole purpose of determining if there was data on the **SUBJECT DEVICE**, showed that the **SUBJECT DEVICE** was "factory reset," and likely had no viewable data.  Nonetheless, given the strong likelihood that evidence relating to TROWER's fraud was contained on the **SUBJECT DEVICE**, evidence regarding how the **SUBJECT DEVICE** had been reset or wiped, or that TROWER had deleted particular files or programs after being confronted regarding that fraud, could be evidence of TROWER's consciousness of guilt relevant to the crimes under investigation.

**E.     TROWER's Use of the SUBJECT DEVICE**

55.     As stated above, there is probable cause to believe that TROWER utilized the **SUBJECT DEVICE** to perpetuate her fraud by:

- Utilizing services offered by Right Networks to remotely access Evil Bikes's QuickBooks account to hide journal entries that showed fraudulent payments she made to herself from Evil Bikes's Wells Fargo bank account, causing me to believe there is probable cause the **SUBJECT DEVICE** would contain evidence of her use of Right Networks and QuickBooks, and also files utilized by TROWER to determine what should be input into QuickBooks;

- Logging on to her Wells Fargo bank accounts or her e-mail accounts, causing me to believe there is probable cause the **SUBJECT DEVICE** would contain evidence those websites were accessed;

- Using software to create fake invoices that were used to defraud Evil Bikes into giving TROWER reimbursement for expenses she did not actually incur on behalf of Evil Bikes, causing me to believe there is probable cause the **SUBJECT DEVICE** would have copies of the invoices on it; and

- Performing a "Factory Reset" of the **SUBJECT DEVICE**, or a similar method of erasing the data contained on the **SUBJECT DEVICE**, causing me to believe that JOAN TROWER had consciousness of guilt that compelled her to erase or attempt to erase the contents of the **SUBJECT DEVICE.**

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

56.     Based on my knowledge, training, and experience and what other law enforcement personnel have told me, I know that electronic devices can store information for long periods of time.  Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device.  This information can sometimes be recovered with forensics tools.

57.     There is probable cause to believe that things that were once stored on the Device may still be stored there, for at least the following reasons:

Affidavit of Andrew Cropcho -- Page 15
USAO 2018R00744

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

- Based on my knowledge, training, and experience and what other law enforcement personnel have told me, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

- Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

- Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

- Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

58.   *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device were used, the purpose of its use, who used it, and when. There

Affidavit of Andrew Cropcho -- Page 16
USAO 2018R00744

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  is probable cause to believe that this forensic electronic evidence might be on the Device

2  because:

- Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

- Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

- A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

- The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

Affidavit of Andrew Cropcho -- Page 17
USAO 2018R00744

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

- Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

59. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the Device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the devices to human inspection in order to determine whether it is evidence described by the warrant.

60. *Manner of execution.* Because this warrant seeks only permission to examine devices already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

Affidavit of Andrew Cropcho -- Page 18
USAO 2018R00744

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

**CONCLUSION**

61.     Based on the foregoing, I request that the Court issue the proposed search warrant.  Accordingly, by this Affidavit and Warrant, I seek authority for the government to search all of the items specified in Section I, Attachment B (attached hereto and incorporated by reference herein) to the Warrant, and specifically to seize all of the data, documents and records that are identified in Section II to that same Attachment.

Andrew Cropcho, Affiant
Special Agent
Federal Bureau of Investigation

The above-named agent provided a sworn statement attesting to the truth of the foregoing affidavit by telephone on this 20th day of May, 2020.

MARY ALICE THEILER
United States Magistrate Judge

Affidavit of Andrew Cropcho -- Page 19
USAO 2018R00744

**ATTACHMENT A**

**Device to be Searched**

The Hewlett Packard Spectre laptop (Serial # 5CD73129JP), currently located at 1110 3rd Avenue, Seattle, WA 98101

**ATTACHMENT B**

**Information to be seized by the government:**

1.      All records on the Device described in Attachment A that constitutes fruits, contraband, evidence or instrumentalities of violations Title 18, United States Code, Sections 1028A (Aggravated Identity Theft); 1343 (Wire Fraud); 1344 (Bank Fraud); and/or 1519 (Destruction, Alteration, or Falsification of Records), and involve JOAN TROWER since July 1, 2015, including:

a.      Evidence of the SUBJECT DEVICE user's contact with banking institutions, including communications that would show ownership of certain bank accounts, and deposits and withdrawals into those accounts;

b.      Communications with or records for or from third party accounting firms, or other service providers, working with the SUBJECT DEVICE user's to assist with Evil Bikes' tax, accounting, or other related work for businesses that the SUBJECT DEVICE user was an agent of;

c.      All communications, records, and documents regarding Evil Bikes or its employees or owners;

d.      Communication with the owners of Evil Bikes, or any records or documents, regarding payment of services provided, rendering of services provided, types of services provided, and any accusations or explanations of misconduct;

e.      All communications with M.H., J.R., or DAVE JOHNSON;

f.      Information related to taxable income for the SUBJECT DEVICE user;

g.      Evidence indicating the SUBJECT DEVICE user's state of mind as it relates to the crime under investigation;

h.      Evidence of the SUBJECT DEVICE user accessing Evil Bikes's QuickBooks or other accounting databases;

i.      Communications with other persons regarding accusations of fraudulent conduct;

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

1            j.        All data or information that serves to identify any persons who use or

2 access the SUBJECT DEVICE, or who exercise in any way any dominion or control over the

3 SUBJECT DEVICE.